LOUISA KERKHOFF et al., Appellants, v. AUGUST MONKE-MEIER et al., Appellees.

WILLS:  Sanity—Burden of Proof.  Sanity is presumed.  Burden of
1    proof to show the contrary rests on him who so alleges.

WILLS:  Undue Influence—Will Contrary to Attempted Influence.
2    Conceding, *arguendo*, that testator was easily influenced by reason of certain delusions, yet undue influence may not be predicated on the fact that testator was advised to make an *unequal* distribution, when an analysis of the will reveals a distribution of his entire estate by a series of devises practically *equal.*

EVIDENCE:  Opinion Evidence—Sanity.  Nonexpert witnesses may
3    testify to the *sanity* of a person on no other showing than that they had never, during long acquaintance with the person, observed anything strange, unusual, or unnatural about him.

*Appeal from Lyon District Court.*—W. D. BOIES, Judge.

JANUARY 20, 1920.

THIS is an action to set aside the probate of a will, on the ground that the testator, at the time of the making of the will, was wanting in testamentary capacity, and was unduly influenced in its making.  The cause was tried to a

jury, and a verdict returned for the defendants. Plaintiffs appeal.—*Affirmed.*

*T. F. Bevington, E. C. Roach,* and *Geo. W. Kephart,* for appellants.

*Simon Fisher* and *T. E. Diamond* for appellees.

GAYNOR, J.—On the 17th day of April, 1902, Henry Monkemeier executed the following will:

"(1) It is my will that all my just debts and my funeral expenses be paid as soon as conveniently may be done after my decease.

"(2) All the rest, residue and remainder of the property and estate, real, personal, and mixed, of every name, nature and description, of which I die seized or lawfully possessed, I give, devise and bequeath to my two sons, August Monkemeier and Frederick Monkemeier, share and share alike, subject, however, to the following bequests and charges which I hereby make a lien upon and charge against my said real estate:

"(a) To my five daughters, Louise Kirckhoff, Mary Billings, Elizabeth Hamilton, Emma Monkemeier and Martha Monkemeier, I give each the sum of one thousand dollars, to be paid to them by my said two sons within one year after my decease.

"(b) To my adopted daughter, Linda Monkemeier, I give the sum of one thousand dollars, to be paid to her by my said two sons when she arrives at the age of eighteen years. I further direct that until said Linda Monkemeier arrives at the age of eighteen years if she lives so long, or if not, so long as she shall live, she shall have from my estate a support, maintenance and education equal to that which has heretofore been enjoyed by each of my said five daughters and such as she would have had if I had lived and she had remained a member of my family. The cost of such support, maintenance and education shall be paid equally

by my said two sons from the property and estate herein devised and bequeathed to them.

"(3) In case before the vesting of the devises and bequests herein given, either or any of my children should die, leaving a child or children, the devises and bequests to any such decedent shall go to his or her descendant or descendants. If either or any should die without children, if the decedent is a boy, his devise and bequest shall go to his brother; if a girl, her bequest shall be divided equally among my remaining children, the heirs of any decedent taking their parents' share. If both my sons should die without issue, then my property and estate shall be equally divided among all my remaining children, the heirs of any decedent taking their parent's share. In construing this paragraph, my said adopted daughter Linda shall be deemed and counted as one of my children.

"(4) I nominate and appoint my son, Frederick Monkemeier, to be the guardian of the person and estate of my said adopted daughter, Linda Monkemeier, and desire that if possible she shall have a home with him until she become of the age of eighteen years, the expenses of such home being paid as hereinbefore provided.

"(5) I nominate and appoint my friend Frederick Thies to be the executor of this my last will and testament."

At the time the will was made, deceased was a resident of Lyon County, and had eight children, seven of whom were born to him, the eighth being an adopted daughter. Of these children, six were girls and two were boys. The will was made in Freeport, Illinois, and left in deposit in the Savings Bank of Freeport until his death, which occurred on the 13th day of October, 1915. At the time of his death, he was about 70 years of age. The will was duly admitted to probate in the district court of Lyon County, Iowa, on the 18th day of February, 1916. This action was begun on the 14th day of September, 1917. The plaintiffs are the

daughters of Henry. The defendants are the sons and the adopted daughter. At the time of the making of the will, the deceased was a widower. His wife died in 1887, just prior to his coming to Lyon County. He took up his residence in Lyon County in 1887. He never remarried.

This action is brought to set aside the probate of the will on two grounds:

(1) That Henry, at the time of the execution of the will, was of unsound mind, and did not possess testamentary capacity.

(2) That its execution was procured by undue influence exerted upon him by the defendants, his sons, and by Frederick Thies and William Washer, and does not express or represent his will in the matter.

The defendants appeared, and denied the allegations upon which plaintiffs based the right to have the will set aside.

The cause was tried to a jury. At the conclusion of the evidence, the court withdrew from the jury the claim of undue influence, and submitted only the other question, to wit, the testamentary capacity. The jury returned a verdict for the defendants, and this verdict establishes the ultimate fact that Henry, at the time of the making of the will, did possess testamentary capacity. However, the jury was not required to go so far as to determine that matter affirmatively. Their verdict would have support, if the evidence offered failed to affirmatively show that he did not have testamentary capacity. The burden is on the plaintiffs to show that he did not, and the verdict indicates a failure on the part of the plaintiffs to carry this burden to a successful issue. The presumption is in favor of sanity. The presumption is that he was capable of making a will. A failure to prove, by a preponderance of the evidence, the facts upon which plaintiffs predicate their right to the re-

1. WILLS: sanity: burden of proof.

lief prayed for, justifies the verdict. *In the Matter of the Will of Coffman,* 12 Iowa 491; *Webber v. Sullivan,* 58 Iowa 260.

Before proceeding to a disposition of the errors relied upon, it is well that we have before us somewhat of the life and character of the deceased and his mental make-up, together with his relationship to and conduct towards those who are now contending against, and those who are seeking to support, the instrument in controversy.

The deceased, Henry Monkemeier, was born in Germany. He came to this country when he was nine years of age, and located in Freeport, Illinois, where he worked on a farm. When he reached manhood, he married at Freeport, and as a result of such marriage, seven children were born to him, five daughters and two sons. The five daughters are the plaintiffs in this case. The sons and an adopted daughter are the defendants. The adopted child was his granddaughter, and was adopted by him when but a small child. Her mother was Henry's daughter, and is known in this record as Emma Burnett. At the time of the making of the will, this adopted daughter was about 7 years of age. Louisa, his oldest daughter, was born in 1872, and was therefore, 15 years old when her mother died, and 30 years old at the time the will was made. At the time of the mother's death, Martha, the youngest daughter, was but 2 years old. About 6 months after the mother's death, Henry moved to Iowa, and onto a farm in Lyon County, purchased by him about a year before the mother died. On this farm he constructed what appears to be a very comfortable and well-appointed home. In this home he gathered his boys and girls. The boys were younger than any of the girls except Martha. The utmost harmony seems to have prevailed in the household. All the children appeared and testified in this case, and none complain of the father's care, nor does it appear that any controversy, any dissension, any

dissatisfaction arose between the father and the children, or among the children themselves. They lived harmoniously. Each did his bit. Louisa, the oldest, at first took the mother's place in the household, and the others helped in the home and in the field. Each, as he grew in strength, performed the task assigned. No child complains of any conduct on the part of the father towards himself. Indeed, there is a tacit concession in this record that the best interests of his children were the dominating thought of his life. He was an independent thinker, and held a hostile mind against those social forms that sin against the strength of youth—those sickly forms that err from honest nature's rule. He believed in righteousness; believed that the mother ought to be the dominating spiritual influence of the home; that through her the children had come into the world; that by her their lives should be directed into the paths of righteousness. He taught that the plastic mind of the child found its first and lasting impressions in the home; that in its early years it easily yielded to impressions, to teaching, to example, to precept; that in its maturer years the teaching, the example, and the precepts of the home would be of controlling influence on its life; that the baptism of righteousness should come to the child in the home, and through the mother. So he said that "the mother is the baptizer of her children. She gave them the first birth, and on her is imposed the duty of the second birth." So he taught that the duty of the mother to the child was not performed, completed, or sufficient when she took the child by the hand and led it to the altar of the church to be perfunctorily baptized; that such baptism was a mockery and blasphemous; that baptism was nothing, except as the outward and visible sign of an inner and spiritual grace. Though he often spoke harshly of preachers, though he sometimes condemned their methods, though he sometimes questioned their sincerity, though he sometimes ex-

pressed the thought that churches did not come up to the full measure of responsibility that they assumed as teachers and leaders of men, yet, with all, we are impressed with the conviction that this man was intensely religious. His religion may not have been of the orthodox kind. He was not wedded to creeds or dogmas. He was an intense reader of the Bible. He read it and interpreted it in his own way. He believed implicitly in the teaching of the Bible. He believed it is our constitution, our supreme law. He wanted to be guided by it. He sought for the truth in it, and out of his reading he gathered the thought that the preachers to whom he listened were not expounding it so as to bring to the people a knowledge of its spiritual meaning. As he said in his letter, which has been introduced in evidence, and upon which is predicated the thought that he was suffering from chronic delusional insanity:

"The preachers nowadays and in all days have preached the dead Christ, and get no further. They all preach that, 1908 years ago, the Jews crucified Christ, the Son of God. The people read the same story in the Bible, and pity Christ, and get no further. It seems they never catch onto the real meaning of the story of Christ. Church, church, and nothing but church is all that the people believe nowadays. Righteousness is a thing of the past. The Bible doesn't teach that a person must go to church and be baptized with cold water. That is mockery. The mother is the only baptizer. This is her duty. If she neglects this, we cannot expect the people to be good. It is my best and strongest belief that, if mothers bring up their children in a good, mannerly way, learn them good manners, learn their children not to lie, direct or indirect, she is doing her duty. The person that lies crucifies Christ. The mother is the only baptizer. She gives birth to the first man, and ought to give birth to the second man, the new man. This is God's command. If she don't baptize her children with God's

command, they will never be baptized in all their lives. Mothers should do this with their own common sense. Let churches and pastors go to the dickens. Common sense is the Bible. Common sense is wisdom from the Bible. The Bible is our constitution in this world. God is a spirit, and the Bible is written in spiritual meaning. Everyone can read it, but all cannot catch the real meaning. A great many mothers bring their children in the right way, in spite of all the churches, but the majority do not do this. The church is in the way. The mothers don't believe in their own common sense. The pastor has got them so they believe in nothing but the church, going to the pastor, and having their children baptized. They don't lay any weight on righteousness. Let the children grow up afterwards according to their own will."

He goes on to say further that the mere going to church, the mere taking of children to the church for baptism and then abandoning them to their own devices does not make them good Christians; that, even after going to church and being baptized, they grow up to manhood without belief, without any belief in baptism, or in the church. He says further:

"And so we are here in this world of nowadays. Some are good and some are bad. My opinion, with all the wisdom I have from the Bible and my own common sense, is that the public school, no other school, is the most needed thing in the world for the betterment of people. The betterment must be founded in the home and in the public school, and what is most needed is the mother and her teaching. The word 'Christ' must be translated in our language. It means righteousness, and only through Christ (righteousness) can we come to God and Heaven. Our constitution is founded in righteousness, but what would it amount to if the majority of the people rejected the law of our country?"

The excerpts above were taken from a letter written by

the deceased in 1908, six years after the will in controversy was executed. He seems to have entertained and expressed these ideas before and at the time the will was made. Another letter was introduced in evidence, written in 1912. This letter was written, we take it, to his daughter Mary, and some friends. In this letter he dwells on the same subject, and says:

"Now, Rosetta, be careful how you read this. I don't claim that the people who don't go to church are good or in the right, by any means. I believe in the teaching of the Bible, but the Bible is no story book. It is the print on the wall. Everyone who knows how to read can read it, but everyone cannot catch its real meaning. I believe everyone must be born anew. He must be baptized, or be an Anti-christ. The mother must do this baptism, as it is the mother that gave birth to the first man. She must likewise bring forth the second, the new man, in her children. The mothers of today do not believe in this kind of baptism, because the church belief is in the way. The mothers believe what the pastor says, bring the children to the church, and have them baptized with water. Water doesn't baptize anybody. Now, Rosetta, don't content yourself with what I write. Examine the matter yourself in your neighborhood. Do the mothers pay attention to this main, genuine bringing up of their children? Do you believe that the pastors can do what the mothers ought to do? What do the people go to church for? They don't go to church for fun. They got something on their minds. They are hunting Christ in the church. Christ is not in the church. The church is nothing but an empty, worthless building, the same as when we read in the Bible the two disciples came to Christ's grave, and found nothing but an empty grave, and some sweat rags, and that same morning a woman saw Christ, and he told her, 'Tell the children where I am.' So it is the woman, the mother, that must baptize her chil-

dren right from the start. A pastor can do all the preaching and teaching, but to start at the hind end is a mistake. The pastor preaches to the people of Christ, and he doesn't know who Christ is. He likes the cream, and the people get the whey. The church belief is only the shadow of real Christianity. The outward dress don't make the man. A person must be a Christian within. Don't throw your good common sense away. Christ is not dead, as people believe. Christ is only dead in the people without righteousness. God gave people thoughts. They are the guide. If we nail our good thoughts fast, hands and feet, and obey our bad thoughts, the devil is our God."

A new subject is introduced in this letter. His ideas on this subject are made the basis for a claim of delusional insanity. He says:

"Just think of the suffragists! It is a new sentiment sprung up in this country—a new kind of weed. What kind of fruit it will produce we don't know. Women are complaining. They want the equal right with the men to vote. How are you fixed, Rosetta? Do you want to go to the polls and vote? Now, Rosetta, without asking, I know that you don't, and your Aunt Minnie,—not at all. I know her too well. I have known her for a long time, too. She has stuck to her own duty, and has done it remarkably well. I have seen no one yet that could beat her. I have always had my eyes open, too. When the time comes when all the women go with the men to the polls to vote, there will be some fun then on election day. The automobiles will run over the road like wild buffaloes with a prairie fire behind them. The house and the children will then be left at home to the mercy of whatever. The suffragists will elect Carrie Nation for our president, and then just imagine! She, with her hatchet, will cut all the saloons to slivers, and with all her women officials, each with a broom, will sweep the saloons off the face of the earth, and then we will have tea

parties. Then the teacups will steam to burst, and the little cups and saucers will clatter to beat beer glasses. Now, Rosetta, I have written you a lot of nonsense. Can you beat it? But when it comes to facts, I am at my post, too. I don't believe in this silly monkey work, that a woman should go to the polls and vote. I believe a woman should wear her own dresses. She should tend to her own business at home; make a good home and live a good decent life. What is a woman good for if she neglects her duty at home? Is she here to hang style on? We can hang style on a fence post. I consider a woman too good to use her for a monkey toy, or to hang style on."

We have set out this much because this is practically the only basis upon which contestants founded their claim that Henry Monkemeier was subject to chronic, delusional insanity, incapacitating him from making a will; and this is the only foundation, practically, upon which they rest the claim that he was so weak mentally that suggestion was sufficient to bend his will to the will of another.

We will not take up the errors relied upon in the order in which they are presented in argument by counsel, but will dispose of all that, under this record, we deem possessed of any merit requiring any discussion.

It is claimed that the court erred in withdrawing from the consideration of the jury the claim of undue influence. Counsel concede,—and counsel could not do otherwise, under this record,—that, in all the ordinary affairs of life, in the relationship to his home, his family, and his friends, in the discharge of his public duties, and in the management of his private affairs, Henry Monkemeier possessed no hallucinations, and was absolutely normal. Indeed, nothing appears in this record even tending to show that there was anything abnormal, unnatural, or unusual in his conduct, or in his speech quoted above.

2. WILLS: undue influence: will contrary to attempted influence.

It is claimed by counsel that, on the question of undue influence, these vagaries or idiosyncrasies or "delusions," as counsel calls them, disclose a condition of mind that made it easily subject to any influence which might be brought to bear upon it, when urged to act to the prejudice of the natural rights of the daughters in the distribution of his property. Certainly, the entertaining of these ideas, peculiar though they may be, and unorthodox,—though smacking strongly of good common sense,—does not bear evidence of irrationality such as destroys in its possessor the capacity to make a valid will. Mere weakness of the mental powers will not render a person incapable of making a valid will, so long as he retains mind enough to know and comprehend, in a general way, the nature and extent of his estate, the natural objects of his bounty, and the disposition he desires to make of it. See *Perkins v. Perkins,* 116 Iowa 253. All these he possessed, and, unless his peculiar notions touching baptism and suffrage tend in some way to show that it created in his mind some feeling or sentiment against women, and, indirectly, against his daughters, which, when played upon by the fingers of designing men, led him to disregard their natural claims upon him, it cannot have any consideration.

But, even if this could be rightly claimed for it, there is no evidence that this discordant string was played upon. There is no evidence that these boys even knew that he had made a will, until the year 1915; that these boys ever spoke to him about making a will. The only evidence that anything was ever said or done by those charged with using undue influence, is found in testimony tending to show, or showing, that Henry accompanied a friend on a visit to Germany in 1902; that, prior to his going, his friend Thies advised him that he would better make a will, before he left for Germany, and that he would better give the boys the best of it. Henry replied, in substance, that "the law makes

a disposition of property that is fair and just. My daughters are as dear to me as my sons. I am satisfied with the disposition that the law will make of it." However, on his way to Germany, he stopped at the town of Freeport, to visit a friend, and while there, this will was made, and left on deposit in the bank. None of those charged with having undue influence over him were with him at the time the will was made, nor does it appear that anyone knew, at that time, that he contemplated making a will. He made it, however, and a very noticeable feature of this will is that it emphasized what Henry told Thies, when Thies urged him to make a will giving the boys the best of it. At that time, Henry had 194 acres of land. The record shows it was worth from $35 to $50 an acre. Figuring it at $47.50, as a fair valuation, it would be worth at that time $9,215. It will be noticed that he gave to his five girls and his adopted daughter $1,000 each, and he made the same a lien upon and a charge against the land bequeathed to the sons. It will be noted further that it is provided in the will that the sons should support the adopted daughter, who was then but 7 years of age, until she was 18 years of age. Figuring, therefore, we find that the land, which was worth the sum above named, had impressed on it what would be equivalent to $7,000, leaving a balance to be divided between the sons of approximately $2,215. So it is apparent that, even if what were claimed to be hallucinations might have had the effect of prejudicing him against his daughters in the disposition of his property, even though it might be claimed that what was said by Thies to Henry might have influenced him in making the disposition of his property, it is certain that he was not influenced by it.

Under no theory of the case, giving to all the testimony of the plaintiffs its greatest probative force, would a jury be justified in saying that the testator was unduly influenced in the making of the will in question. The subject

of testamentary capacity and undue influence has been so frequently considered by this court that we do not feel like incumbering this record with a discussion of our prior decisions upon these questions.   The trend of all the decisions is to the effect only that any testimony which tends to show weakness of mind, that tends to show a condition of mind that would render the possessor easily influenced, or might render him easily influenced, is competent upon the question of undue influence, when it is shown that some influence has been exerted that might have the effect of subordinating his will, in its then condition, to the will of a stronger mind.   The weaker the mind, the less influence it takes to subordinate it to the stronger.   But where we find a mind strong, dominating, and self-asserting in all the ordinary affairs of life, it takes a stronger showing, to find subordination to the will of another, than when the mind and body are enfeebled by age or weakness, or any of those things which tend to affect its stability and power of resistance.   The possession of hallucinations or delusions is not, in itself, sufficient.   It must be shown that the influence was exercised along the line of the hallucination, and that the act called in question is the product of the hallucination or delusion; for a person may be entirely sane on all other subjects, and capable of making a valid will, even though he possesses insane delusions.   Unless it is made to appear in some way that the act was the result of a delusion, or that he was influenced by it in doing what he did, or that, without this operating upon his mind, he would not have done what he did, proof of the delusion is insufficient to defeat his act.   The fact that the testator is a spiritualist, and entertains the views of that sect, is not sufficient in itself.   See *Otto v. Doty,* 61 Iowa 23; *In re Will of Dunahugh,* 130 Iowa 692.   Indeed, there is not found in the books a well-considered case in which it has been held that the showing made here is sufficient to justify a jury in saying

that the will in question was the result of undue influence.

Proof of mere opportunity does not sustain a contention that the opportunity was taken advantage of. No act is shown in which the testator surrendered his will to those charged with having unduly influenced him. For the purposes of this case, we might concede that he entertained insane delusions touching baptism; but not all insane delusions render one incapable of making a will. A man may possess all the mental qualities essential to the transaction of even intricate business, and yet have delusions about other matters which do not affect or concern the act which he is required to perform. There must be some relationship between the act charged to be the product of the delusion, and the delusion found to exist.

So we say the court was right in not submitting this question to the jury. A verdict for the plaintiffs on the theory of undue influence, operating on the mind of the testator at the time of the making of this will, subordinating his will to the will of the parties charged with having exercised undue influence, would have no support in this record; and we pass this contention of the plaintiffs without further comment.

Assuming that the record was rightly made, and no error committed prejudicial to the plaintiffs' rights in the making of the record, we have to say that the plaintiffs have failed to carry the burden they assumed to a successful issue. Though not necessary to the determination of this case, we are of the opinion that, under the record made, the verdict of the jury is supported by a great preponderance of the evidence.

We have further to say that, under the record made, it would not have been error for the court to have instructed the jury to return a verdict for the defendants.

This brings us to a consideration of the other errors assigned.

It is claimed that the court erred in the making of the record that went to the jury, to the prejudice of the plaintiffs. It is claimed that the court erred in the admission and rejection of evidence, and our attention is especially called to the rulings of the court which, it is claimed, were prejudicial to the plaintiffs. Thirty-three assignments are made on which error in this respect is predicated. No good purpose would be served in reviewing specifically these several points. They are all governed by well-recognized rules. We have examined each error assigned, and the ground upon which error is predicated, and nowhere do we find the ruling of the court prejudicial, in the light of what preceded and followed the matter called in question. Some of the questions were of that character and so framed as to call for conclusions and comparisons not warranted by anything in the record. Others called for conclusions of witnesses, rather than for the statement of facts. Others were not cross-examination.

Objections are urged to the testimony of nonexperts, called by the defendants to testify to the sanity of the testator. These witnesses were well acquainted with the testator; had known him during all his later life; had observed his conduct before and during the time when it was claimed he was controlled by delusions; and testified

3. EVIDENCE: opinion evidence: sanity.

that he was, in their judgment, of sound mind. The objections to this testimony are based on the thought assumed that the testator was suffering from "chronic delusional insanity," or paranoia, and that these witnesses were not competent to testify on that subject. They were competent, however, to testify that they observed nothing strange or unusual in his manner and conduct, indicating an unsound mind. Their right to testify is bottomed on the thought that men who are possessed of hallucinations, who are insane or unsound in mind, give some manifestation of that

condition in their intercourse with other men. Where one has known a person for a long time, has seen him in the transaction of business and in social life, and has observed nothing in his demeanor strange or unusual or unnatural or inconsistent with rationality, he is competent to give his opinion that he is of sound mind. Unsoundness of mind makes itself manifest, and, before one can be called to testify that someone is of unsound mind, he must be able to detail and place before the jury some manifestation observed by him inconsistent with rationality, and his opinion then is based upon those observations, and must be weighed by the jury in the light of the revelations made by the witness touching the things he observed. The normal man ordinarily is not distinguishable in his talk, manner, or conduct from all other rational men. The irrational man, the man of unsound mind, may or may not manifest the condition of his mind in his conduct, speech, or intercourse with men; but one who is called to testify that he is of unsound mind must be able, before giving his opinion, to point to some manifestation which indicated a mind in some way abnormal.

It is next contended that the court erred in its instructions to the jury.

We are not pointed out definitely to anything in the instructions which is not in harmony with the law that does govern, and ought to govern, a jury in determining the question involved in this case. We have read those instructions with care, and find that they fairly state the law, and certainly were in no way prejudicial to any rights of the plaintiffs in this case.

It is next contended that there was misconduct of the jury. Charges were made, impeaching the integrity of the jury. Proof of this was submitted to the court on affidavits. There were counter affidavits filed by the jurors whose integrity was called in question. The proof offered by appel-

lants is insufficient upon this point, and justifies us in saying that the charge has no fact foundation to rest upon.

Upon the whole record, we think the plaintiffs have had a fair and impartial trial. We see no ground for reversing the action of the court. Its judgment is, therefore,— *Affirmed.*

WEAVER, C. J., LADD and STEVENS, JJ., concur.