IN RE ESTATE OF A. L. RANSOM.

ELZA TAYLOR et al., contestants-appellants, v. D. W. HARRIS, executor, et al., proponents-appellees.

No. 48089.

(Reported in 57 N.W.2d 89)

February 10, 1953.

George A. Milani and Guernsey & Powers, all of Centerville, for appellants.

Stuart & Stuart, of Chariton, for appellees.

Bliss, J.—The testator lacked a few days of being eighty-six years and six months old at his death on May 14, 1950. The primary cause of his death was pneumonia. He made his last will on January 27, 1950. Its due execution is not challenged. He had never married, and all those who might be considered as having any claims upon his bounty by reason of kinship were collateral heirs, none of whom had a closer relationship to him than that of niece or nephew.

He was a farmer by occupation and actively engaged as such until the last years of his life, and during this last period he looked after and managed his land, but leased it to others. By his industry, thrift and good business judgment he had acquired ap-

proximately 1100 acres of farm land, some town property and substantial balances in three or more banks at the time of his death.

He and his brother, Joseph Hooker Ransom, who was also a bachelor, after the death of their parents continued to live in the old parental home just north of the corporate limits of the town of Moulton, in Appanoose County. The two brothers owned between 1600 and 1700 acres of land. Joe died, apparently intestate, in or about 1935. They had lived alone in the old home. Although the pertinence of the fact to this proceeding is not clearly apparent, it appears that "Uncle Abe", as he was called by everyone, and Joe were bound and robbed in their home one night, by assailants whom Abe recognized as his and Joe's relatives. The booty was only $7.20, and there was no criminal prosecution, and the record discloses nothing further respecting the identity of the robbers.

Shortly after Joe's death, Abe closed the old home, leaving it furnished, but not occupied by anyone. On a part of his property and near his home, at this time, Mrs. Nora K. Probasco was operating what is spoken of as a "nursing home" and as an "old-people's home." Mr. Probasco had died, and her second husband, a Mr. Clark, had also died. Abe Ransom began living in this home in 1937 or 1938. He enjoyed living there and so expressed himself to different ones. He was well cared for. Mrs. Probasco set a good table. He enjoyed the companionship of old friends and acquaintances who were also inmates of the home. Much of his land was conveniently accessible to the home, which enabled him to give it proper attention and lightened his labors in doing so. Until his physical infirmities interfered he spent much of his time in repairing fences and buildings or in supervising the work. In 1942, or about that time, he was very sick with pneumonia, to the extent that it was doubtful whether he would recover. He was confined to his bed and premises for three months. He had excellent care and completely recovered. He appreciated what was done for him and suggested to Mrs. Probasco that the home should be enlarged and improved so that more inmates could be benefited.

About the year 1945 he made plans to move a vacant house from Moulton out to the Probasco home. When Orpha Taylor

learned of the plan she protested to Uncle Abe, but he was not dissuaded. She made known her objections to others and stated that the plan would cause trouble, and information came to Abe, directly or indirectly, from Orpha, that she had said the house would never be moved. But Abe employed a house mover to take the house off its foundation and move it. While the house was jacked up on the foundation a bale of straw which had been ignited was found under it, but the fire had smothered out or had been put out. The house mover informed Abe that he had been told not to move the house. All of his adult life Abe had been known as a man of determination. The house was moved to the Probasco home, and Abe had a basement excavated under it and the two houses joined, a heating plant installed and other remodeling done. In showing the improvements to others he expressed his pleasure at making the home a better place for the inmates, and his inability to understand why anyone would object to what he had done.

Abe, naturally, grew physically feebler with his increasing age. His heart was somewhat impaired. But he insisted on giving attention to his property, though he always left word with someone at the home just where he was going and where he could be found. Sometimes he would be late returning, and Mrs. Probasco or some of the inmates would worry about him. On these occasions Mrs. Probasco would send Mr. Ware or Henry Lauderback, or they would go of their own volition to look for Abe. Mr. Lauderback, about ten years younger than Abe, lived at the home. He testified that he usually found Abe at the place where he said he would be, trying to complete the particular work he was doing, and that Abe was usually somewhat irked because he came for him, and would remark, in substance, that he knew how he got there and he knew the way back.

During the last year or two of his life Abe had increasing difficulty in controlling the evacuation of his kidneys and his bowels, and would sometimes fail to make timely access to the toilet. His clothing and his bedding needed more frequent attention. He regretted this very much and was greatly embarrassed. This infirmity confined him more closely to the Probasco premises, or to his old home, which was about a quarter of a mile distant. During these years most of his business transactions in

selling hay, grain and other farm products were consummated by the purchasers calling on him at the home. The price would be agreed upon and the purchaser would go to the particular farm to get what he had bought and would return with the weights and make settlement with Abe. He handled the sales and the settlements without assistance from anyone up to the time of his last sickness. Because of doing business in this way he often had large sums of money at the home. Sometimes he would take it to the bank, but more often Mrs. Probasco or Mr. Lauderback would make the deposits. Mrs. Probasco kept his books of account during his last year. She also wrote the body of his bank check on occasion, but he invariably signed his name to it. His signature was written with a large bold hand, with no indication of any tremor. If a check was payable to "Abe Ransom" he endorsed it just that way, but if it was payable to "A. L. Ransom" that was the way he endorsed it. He wrote the "A. L." with a single flourish, placing the "L" within the loop of a large "A".

Abe Ransom was always a sincerely religious man. He not only supported the Christian Church of Moulton, which he regularly attended, but he daily lived the life of a Christian. He was scrupulously honest in all of his dealings all of his life. There is no evidence in the record to the contrary. One or two witnesses said he was close in money matters, and even stingy. No incidents are shown to sustain the last statement. He was conservative and a sound investor. He insisted upon full payment of financial obligations owing him, but he was just as insistent in the exact and full payment of his own obligations. One witness related that he bought a quantity of hay from Abe, who told him to get the hay and have it weighed and leave the money—a cent a pound or $20 a ton—with the weighmaster. When Abe called for the money he computed what was due him, and found that the purchaser had left a dime too much. He walked to the purchaser's home in the country and returned the dime. The purchaser remonstrated with him for doing so, and Abe replied: "If you had owed me the dime I would have come after it."

In 1927, or thereabout, the Christian Church in Moulton burned to the ground. It cost $30,000 to replace it, and Abe and Joe paid $10,000 of that amount. He was one of the founders of

the church. He was on the board of elders. He was superinten-dent of the Sunday school and taught the Bible class. This went on for years. He was a student of the Bible and read it daily. Wherever he was, and at every meal, he said grace and gave thanks for the food. He continued to thus practice his religion until prevented by his last sickness.

A few years before his death he was not re-elected as an elder of the church and another took his place as teacher of the Bible class. This hurt him very much. Because thereof, and because of the physical infirmity we have mentioned which later afflicted him, he did not attend church during his last years. There was testimony that he said the Democrats were running the church and kicked him out. He was and always had been an ardent Republican and criticized President Roosevelt (F. D.) for his wasteful spending. A year or two after being relieved as an elder he was made an honorary elder, a position without any duties or responsibilities. He had never been one to accept favors, and the hurt he had received was not eased. He contin-ued to practice his religion though not a church attendant. He read his Bible daily at the old-people's home and he gave thanks at every meal there. Mr. Lauderback testified that he and Abe roomed together at the Probasco home when Abe first came there, but because he (Lauderback) occasionally used profane language Abe insisted on having a separate room for himself. He had always been honest in his transactions with others. His word was always good and he respected the word of others. His land was operated by many tenants for many years without a written lease. One witness had been such a tenant for nineteen years.

After the death of his brother, Joe, the latter's land was dis-posed of by a partition action. Abe acquired most of it. He thought the estate had not been handled with proper expedition. He had also had a will drawn by the Valentine law firm and a later will drawn by Ed. P. Powers. John B. Taylor, vice presi-dent of a bank in Centerville, was named as the executor in that will and had possession of it. The provisions of neither of these wills are shown in the record. The evening of January 25, 1950, Lloyd Probasco, a stockbuyer of Bloomfield, and his wife, Wel-tha, ate their evening meal at the Nora Probasco home. Lloyd

Probasco was a brother of Nora's first husband As the Lloyd Probascos were leaving, Abe followed Lloyd into the front room and told him he had some legal matters to be attended to and asked him if he could recommend a good lawyer. Lloyd told him that he could and that if he, personally, needed a good lawyer he would get Donald W. Harris of Bloomfield. Abe told Mr. Probasco to bring Mr. Harris over so that he could talk to him. The next evening, January 26, 1950, Mr. Harris, accompanied by Mr. and Mrs. Lloyd Probasco, drove to the Nora Probasco home. Abe and Mr. Harris were introduced to each other and visited at some length about mutual acquaintances, and Lloyd Probasco and wife went out of the room and left Abe and Mr. Harris alone.

Mr. Harris, as a witness for proponents, testified that he was thirty-eight years old and, with the exception of three years in the Navy, had been practicing law since 1934; that the evening of January 26, 1950, Nora Probasco met them at the door and he was introduced to her and to Mr. Abe Ransom; that he had met neither of them before, although he had sued Nora Probasco and one of her sons on a note of the latter which she had signed as surety; that after Abe had inquired about his family and they had visited at some length the others left the room, and Abe told him he had some business matters at Centerville in connection with Joe's estate that were not being handled to his satisfaction by Ed. Powers, and he wanted a lawyer who could get things done, "and I didn't discourage him any"; that some of his folks were much interested in placing a guardian over him and "that Ed. Powers was in on that deal"; he told me about the house he had added to Nora Probasco's home, and that he had promised to give her the house; that tomorrow was her birthday and he would like to get it done; he said he first had intended to give her just the twenty acres where the house was, but he said "they have so many people here and they have a big garden and some cows" and because of that he thought she should have forty acres instead of twenty; he said he wanted to get all his business finished up and that he wanted to write a new will; he said he had doctors in mind for witnesses to his will. Mr. Harris testified that he had a portable typewriter in the car, which he placed on the dining room table, and told Abe that he would have to have something from which to get a description of the forty acres,

and Abe promptly gave it to him from memory; that he told Abe he did not wish to take the description from memory, and Nora Probasco was sent to get deeds and abstracts from a trunk; she was gone so long that on Abe's insistence he typed the deed with the description given him by Abe, which the latter insisted was right, and when the abstracts and deeds were brought in he found that Abe's description was correct in every respect; Abe told him that he was to have a life estate in the property and stay there as long as he lived; the deed was so drawn that night and he took it with him to Bloomfield as he did not have his notary seal with him; that he told Abe if his folks were considering the appointment of a guardian for him the recording of the deed might precipitate the proceedings, and that it might be better if he held the deed in escrow for a time, to which Abe agreed, but a little later the deed was recorded; that on the night the deed was signed, Nora K. Probasco, at the request of Abe, signed a receipt that A. L. Ransom had paid in full to January 26, 1950, all sums due her for care and keep and for services rendered Mr. Ransom, and that such payment was made and accepted by the delivery of the deed to her of the forty acres. Mr. Harris testified that he took the receipt and the deed with him that night, and that before leaving there was further discussion with Mr. Ransom about the drawing of his new will, and that he desired Doctors Cox and Sellers of Moulton to witness its execution.

Mr. Harris further testified: that the next afternoon, January 27, 1950, he returned with his secretary, and in her absence he discussed with Mr. Ransom the provisions of the will and took notes thereof; he then dictated the will to his secretary; Nora Probasco was never in the room, but while the will was being typed he asked her to call Doctors Sellers and Cox; after they arrived Mr. Ransom asked them to witness his execution of the will and each of them signed the will as a witness in the presence of the others. Mr. Harris told the witnesses that the will would probably be contested and he wished them to satisfy themselves whether or not they thought the testator, A. L. Ransom, was capable of making a will.

After the introductory paragraph of the will in which the testator stated that he was of sound mind and competent to make

a will, and declared the instrument to be his last will and revoked any prior wills, the will stated in substance:

1. Directed payment of debts etc., and the erection of a headstone at his grave.

2. "I expressly make no provision for the sharing in my estate by Orpha Taylor, Doris Taylor, Elza Taylor, Lou Yates, Velta Davis or any of their surviving spouses, heirs-at-law, devisees or legatees. I make this provision in my Will because it is my express desire that they shall not participate in any way in my estate and this provision is made because of their attitude toward me and by reason of our unpleasant relations."

3. "I hereby give, devise and bequeath the sum of $1000 to Leo Taylor * * * and $1000 to Mabel Houk ** *."

4. "I hereby direct my Executor * * * to convert all of my real and personal property which I shall own at the time of my death into cash for the purpose of making the distribution herein provided."

5. "All of the rest, residue and remainder of my property, I give, devise and bequeath, subject to Paragraphs 1, 2 and 3 hereof, to my heirs-at-law, expressly excluding therefrom the persons named in Paragraph 2 hereof."

6. Directed the executor to cancel and surrender to Mae Lawson her promissory note held by the testator.

7. Appointed D. W. Harris as executor of the will.

The attestation clause signed by E. L. Cox, M.D., and E. D. Sellers, M.D., stated: "We, the undersigned subscribing witnesses do hereby certify that the Testator, A. L. Ransom, signed and executed the foregoing instrument and declared the same to be his Last Will and Testament in the presence of each of us and we subscribe our names hereto, in the presence of each other and at his request and we certify that we believe him to be of sound mind on this date." The will bears the date of January 27, 1950.

The will was filed in the office of the clerk of court on May 16, 1950, and it was set for probate on June 12, 1950, and due notice thereof was given. On June 10, 1950, the five contestants, Elza, Doris and Orpha Taylor, Lou Yates and Velta Davis, filed written objections to the probate of the will, consisting of three grounds, to wit: "1. That at the time of the execution of the

alleged Will the said A. L. Ransom was of unsound mind and incapable of making a Will. 2. That at the time of the execution of the alleged Will the said A. L. Ransom was laboring under delusions which influenced him in making said instrument and caused him to make a disposition of his property therein that he would not have made had he been sane and not influenced by such delusions. 3. That at the time of the execution of the alleged Will the said A. L. Ransom was under the influence of one Nora Probasco to such an extent that his mind was overcome and the said Will was not his Will, but was the Will of Nora Probasco imposed and forced upon him."

The objectors recited in the instrument filed that they were nieces and nephews and part of the heirs of A. L. Ransom.

The twenty-five proponents, other than the executor, filed an instrument in the trial court giving their names and designating themselves as the sole beneficiaries and legatees under the provisions of paragraphs 3 and 5 of the will, and were the only parties in interest as proponents of the will.

It appears from the record that the reason the testator bequeathed to Leo Taylor and Mabel Houk each $1000 more than the other legatees named in paragraph 5 of the will was that their mother, who was his sister, by her will had bequeathed these two children but one dollar each, and had given all the rest of her estate to her sons, Elza and Doris Taylor, and to her daughter, Orpha Taylor (contestants in this action). Leo Taylor had complained to his Uncle Abe about this discrimination and had threatened to contest his mother's will, and Mr. Ransom persuaded him not to do so as it would cost considerable money and would cause dissension in the family, and promised him that if he did not contest his mother's will he "would never regret it." Abe told Mr. Harris that his niece Mabel Houk was a fine girl, came often to see him and never asked for anything, and he wished to reward her because of the small amount her mother had given her by her will.

After the jury was sworn, the proponents established the due execution of the will of Mr. Ransom by the testimony of the subscribing witness, Doctor Cox. The will was received in evidence and proponents then rested. Doctor Sellers, the other subscribing witness, had died before the trial.

The testator being presumed to be of sound mind, the contestants assumed the burden of overcoming .that presumption and of establishing their objections to the probate of the testator's will by the introduction of testimony, which fills approximately two hundred pages of the printed record.

At the close of the contestants' evidence and after contestants had rested, the proponents moved the court to instruct the jury to return a verdict in favor of the proponents on the grounds: (1) That contestants' evidence as a whole, given the most favorable consideration and interpretation, failed to sustain any of the objections filed, and (2) that if the jury returned a verdict for the contestants, it would be the duty of the court to set it aside as not being supported by the evidence.

In addition to said motion, and before it was ruled on, proponents moved the court to separately withdraw from the consideration of the jury the allegations in the objections filed by contestants, that the testator at the time that he executed his said will: (1) was of unsound mind and incapable of making a valid will (2) was laboring under delusions which influenced him in making his will and caused him to make the disposition of his property as provided therein (3) was under the influence of Nora Probasco to such an extent that his mind was overcome, and that the will was not his will, but was the will of Nora Probasco, imposed and enforced upon him.

The court overruled proponents' motion to direct a verdict in their favor, the motions to withdraw the issue of mental incapacity and the allegations of insane delusions, and sustained the motion to withdraw the issue of undue influence.

Proponents then introduced their testimony—about one hundred fifty pages of the printed record. After a few pages of contestants' rebuttal testimony both sides rested and proponents renewed their motion to direct a verdict made at the close of contestants' evidence in chief. In ruling on the renewed motion the court said:

"I want to say to you, gentlemen, in ruling on this motion, I had grave doubts at the close of contestants' evidence whether or not the court, as a matter of law, should take the case from the jury. I decided at that time that there were certain items of evi-

dence that the jury should pass on, and although it was very close, I thought I should overrule the motion at that time. I have in mind the evidence as to the claimed delusions.

"I want to say to you that I have even grave doubts now. If we were operating under the rules as they were prior to the change in our new Rules of Civil Procedure, I think the court would direct a verdict at this time. However, since the new rules have gone into effect, the court can submit it to the jury, and, perhaps then have to act after the verdict and perhaps not. But in any event all the evidence is now in. If the court should direct a verdict, and the Supreme Court would say it was a jury question, it would mean it would be sent back for new trial, and all the evidence would have to be gone into again. I think that the same end may be reached by letting this case go to the jury, perhaps avoiding the necessity for a retrial of the whole case. For that reason, I am not sustaining the motion."

The case was submitted to the jury and upon its failure to reach a verdict it was discharged. Proponents then filed motion, as provided from rule 243 of the Iowa Rules of Civil Procedure, for judgment in their favor, admitting the will to probate, notwithstanding the failure of the jury to return a verdict, upon the grounds that: (1) Their motion, made at the close of contestants' evidence, to direct a verdict for proponents should have been sustained (2) the renewal of said motion, made after the parties had rested, should have been sustained, and (3) the jury deliberated approximately eighteen hours and upon reporting to the court that they were divided six and six and hopelessly deadlocked, the court discharged the jury without a verdict being returned, and the case remained as it was at the close of all the evidence.

The motion being argued and submitted, the court found: "That said motion is good and well founded and the allegations contained therein are true and correct *.* * and it is hereby sustained." The court ordered, adjudged and decreed that the instrument submitted was the last will and testament of A. L. Ransom, and was admitted to probate as such, and D. W. Harris was appointed executor of the will. Judgment for costs was ordered to be entered against the contestants.

Contestants have appealed from all adverse findings, rulings and judgment, and present on this appeal, in substance, the following questions: (1) Did the court err in sustaining the motion for judgment notwithstanding? (2) Did the court err in refusing the opinions of certain of proponents' nonexpert witnesses as to the mental capacity of testator? (3) Did the court err in taking from the jury the question of whether the testator was laboring under certain delusions? (4) Did the court err in refusing to give the jury two requested instructions with respect to said delusions?

The first query suggests error in sustaining the motion notwithstanding. This motion is based on proponents' motion to direct a verdict for them, and the renewal thereof, which motion to direct challenged each of the three objections to the probate of the will, namely, mental incapacity, delusions and undue influence. Contestants state that the court submitted to the jury only the first objection, which alleged the testator was of unsound mind and incapable of making a will. This statement is true in large part. There was no instruction either on delusions or on undue influence. Contestants' two requested instructions on "insane delusions" were not given. But instruction 6 was as follows:

"As part of their evidence, with respect to mental unsoundness of testator, the contestants claim that at the time of the execution of the instrument in question A. L. Ransom entertained certain beliefs or opinions toward certain of the contestants relating to the matter of the appointment of a guardian over him, and with reference to the moving of a house to his farm, and the disappearance of a Bible dictionary, which beliefs or opinions they claim were without foundation in fact. This evidence is proper to be considered by you in determining whether A. L. Ransom was of sufficient mental capacity to make a valid will at the time the same was executed.

"However, an ill-founded belief does not destroy testamentary capacity, and where a testator indulges in an aversion, however harsh, which is the conclusion of a reasoning mind, on evidence, no matter how slight or inaccurate, his will on that account alone cannot be denied probate."

The "beliefs or opinions" mentioned in the instruction are the matters which the contestants designate "delusions."

The verdict having been directed against the contestants, we have read the evidence, and, as required by our decisions, have considered and weighed it, and will review it in the light as favorable to the contestants as the record fairly justifies. The evidence is too voluminous to set it out in detail. Contestants used twenty-five witnesses and some were recalled two and three times for extended re-examination in their case in chief. We shall first discuss the evidence with respect to the testator's capacity to make the will, as introduced by the contestants, including views of the testator that contestants have designated as "delusions." This compels a review of the evidence sufficiently adequate to pass upon the propositions presented.

Lloyd Ellis, sixty-seven years old, a retired minister, one-time Democrat State Senator from Appanoose County, was contestants' first witness. He had been pastor of the Christian Church at Moulton, Iowa, from 1925 to 1929, and had returned for a fill-in pastorate from September 1948 to July 10, 1949. He testified:

"Well, if I may state this very frankly. Abe was one of the substantial citizens of the community of Moulton * * * one of the most devoted members that we had in the congregation * * * economical and frugal, saving and honorable in every way, as far as I ever knew. * * * an elder in the church, chairman of the official board * * * all the time I was there. He was superintendent of the Sunday School most of the time I was there, and taught a class in the Bible school. So far as his contributions were concerned, not liberal, but they always gave something. They supported the church I suppose what we would say, liberally, yes, for them."

He testified that: the church burned in 1926 and was rebuilt at a cost of about $30,000 in 1928, of which sum Abe and Joe contributed $10,000; while he was interim pastor in 1948-1949, Abe did not attend church, and, to the knowledge of the witness, was not contributing; during this last pastorate he was in Moulton only week ends and he visited Abe several times at the Probasco home, and talked with him regarding the church—"Abe said

that * * * certain individuals, naming them, and others in the church had 'kicked him out', as he used the term, of the church and out of his Sunday school class, and that the Democrats had taken over the operation of the Christian Church in Moulton. * * * I offered on a few occasions to send a car out and get him and take him to church, but he did not signify his willingness to come. * * * Mrs. Probasco was about the place during my visits with Abe * * * she showed me a piece of ordinary note paper which listed church members who he claimed owed him debts; * * * one by a man named Sales, one by Rolla Morrow for a crib of corn he was supposed to have bought and not paid for, and quite a number of statements about Dan Davis, Rolla Morrow and other members of the church and what they had done to him. It wasn't any carefully arranged statement about anything. It was rather a jumble of statements written down. I would say it was in A. L. Ransom's handwriting. I was told that it was." Asked if he observed any change in the appearance of Abe in 1948 and 1949, from what it was in 1925 to 1929, Reverend Ellis answered: "Well, naturally over a period of twenty years he had aged considerably, and there was I would say the natural deterioration of the physical as well as the mental side of his life."

We have set out the testimony of this witness quite fully and have omitted nothing of any materiality or relevance. The witness was then asked the following question: "You have recounted your conversations you had with him and your observations of him. What would you say as to whether or not he would be competent to make a will on the 27th day of January, 1950?"

Objection was made that no proper foundation was laid, and the witness had not shown himself qualified. The court rightly sustained the objection. The objection was good on both grounds. The witness had testified to no conversation or conduct on the part of Mr. Ransom that was in anywise inconsistent with his mental soundness and his testamentary capacity on January 27, 1950, or at any other time. Being a nonexpert in the matter inquired about, the only opinion permissible from him, were he qualified, would be limited to a time when he observed the matters to which he testified. There is nothing in the record that he ever saw Mr. Ransom after July 10, 1949, or on January 27, 1950,

when the will was executed. In re Estate of Heller, 233 Iowa 1356, 1363, 11 N.W.2d 586, and cases cited. Before a nonexpert may give an opinion that a person is of unsound mind he must first testify to matters reasonably tending to support such opinion. In re Estate of Heller, supra; Neidermyer v. Neidermyer, 237 Iowa 685, 689, 690, 22 N.W.2d 346; Ipsen v. Ruess, 239 Iowa 1376, 1387, 35 N.W.2d 82; Olson v. Olson, 242 Iowa 192, 204, 46 N.W.2d 1, and authorities cited in each of these cases.

The question was also vulnerable to the objection because the matter inquired about was not a proper subject of opinion testimony. It called for an answer to the very question which the jury was required to answer, and which the jury alone had the sole province and right to answer. The inquiry involved a mixed question of law and fact and was a direct inquiry as to the testator's testamentary capacity. As said in Grismore v. Consolidated Products Co., 232 Iowa 328, 361, 5 N.W.2d 646, 663: "On that question the court must instruct the jury as to the law, and the jury must draw its own conclusion from the evidence." This rule has been followed and reannounced in In re Estate of Myers, 238 Iowa 1103, 1112, 29 N.W.2d 426, Knaus Truck Lines, Inc. v. Commercial Freight Lines, 238 Iowa 1356, 1367, 29 N.W.2d 204, and Ipsen v. Ruess, 241 Iowa 730, 734, 41 N.W.2d 658. See also authorities cited in each of the cited cases; 20 Am. Jur., Evidence, section 799.

That Uncle Abe's opposition to Democrats was not a mental quirk of the last year of his life, but was openly active and persistent for over twenty years, is shown by the reverend's own testimony, to wit: "I was a Democrat all the time that I preached for the church and he was bitter against them because they were Democrats."

Had the witness been permitted to answer the question respecting A. L. Ransom's mentality we may fairly assume it would have been that he was of unsound mind on January 27, 1950. Such an answer would have been inconsistent with his persistence in seeking to have him attend church during his last pastorate, which terminated July 10, 1949.

The witness testified that he did not check to ascertain how many officers of the church were Democrats: "Some of the elders were Democrats. I don't think most of them were Democrats. I

understand Abe didn't like the way the church was being run and said so. There was no change in the basic operation of the church between my first stay and my last stay. There was a change in the officers of the church."

Reverend Ellis was recalled for more direct examination by contestants, and without any additional testimony was asked: "* * * based upon the conversations and visits you had with Abe Ransom, from September 1948 until on or about July 1, 1949, what would have been your opinion as to whether he was of sound or unsound mind?" It will be noted that the opinion asked for was not directed, related or limited to any specific time. An objection that the witness had not shown proper qualifications to express an opinion was sustained.

The witness was asked the same question except the inquiry was to give his "opinion as to whether or not A. L. Ransom, on the 27th day of January, 1950, was of sound or unsound mind?" The objection was made that the witness had not shown himself qualified to express an opinion. It was overruled, and the witness answered: "In my opinion he would be of unsound mind." The objection should have been sustained, for the reasons and the decisions of this court hereinbefore set out. He had given no testimony as to any conversations with, or observations of, the testator on January 27, 1950, the day the will was executed. On re-cross-examination, immediately after he had given his answer, he testified: "What I have told heretofore is the extent of my transactions with Abe Ransom, that is between September of '48 and July '49. I did not see Abe Ransom after July '49. Abe Ransom knew who I was when he was talking to me. Most of the time A. L. Ransom talked coherently. He apparently knew what he was talking about, knew the people that were around him; recognized them and knew who they were." Nowhere in his testimony did the witness give any instance of any incoherent talk by Abe Ransom nor specify any time, place or occasion when he talked incoherently.

With reference to the opinion that Mr. Ransom was of unsound mind, the witness testified:

"I am not altogether basing it on because Mr. Ransom did not like the way the church was being run. Principally that, how-

ever. It was a complete reversal of his attitude of former years. I did not necessarily draw my conclusions that he was of unsound mind because he did not like the way the church was being run, because there were many other things we discussed. [The witness gave no testimony of "many other things".] He discussed with me the attitude of some of his relatives that he thought were plotting against him. He said they had been trying to get his property from him. I don't know anything about whether there was any foundation for that. I only know it was a complete reversal from his former attitude towards these relatives, because he was always devoted to them in the past. * * * He just in a general way told me that they had been up there with a paper trying to get a guardian appointed for him. I don't know that they hadn't. * * * He said he thought his family were scheming to try to get his property away from him. I have no concrete evidence that he wasn't absolutely right and they were trying to get his property."

Speaking of the paper on which Mr. Ransom had noted some of his debtors, the witness said:

"I don't know how much sense they made to Abe Ransom, and I don't know how much of them were right. I don't know but what those people that were named as debtors were debtors of Abe. * * * Every time I was at the Probasco home, I would visit with Abe. We discussed the past quite largely. He talked sensibly about that. * * * of the days when we built the church, and things of that kind, in which he was vitally interested. He related a number of instances in which I know he was right. I do not recall anything concrete that did not sound rational. It was his general attitude and his general statements about things that were. The last time I talked with him was about the first day of July, 1949. I am not basing my opinion on that conversation. It was over the four or five or six times I was with him in the interim of eight or nine months. There is nothing more I care to add."

A little later in the trial the court of its own volition struck from the record the opinion of Reverend Ellis that the testator was of unsound mind.

The next witness was Lloyd Davis, fifty-four years old, the husband of Velta Davis, one of the contestants. He testified that A. L. Ransom moved from the old homestead to the Probasco home in 1937 or 1938 and in the early forties moved a house from Moulton to the Probasco home and attached it to the Probasco home, and dug a basement under it and put in electricity and a furnace. He did not know who paid for it. He testified:

"During the many years I knew A. L. Ransom, I observed he was very conservative—a very saving person—with considerable possessions. At one time I think he had 1200 or 1300 acres of land of his own. I would class him as a religious person. He belonged to and was a faithful attendant of the Christian Church in Moulton as long as his health permitted. He quit going to church. I observed a changed attitude toward the church. He visited and had dinner with us, not very often. He promptly paid his bills. I never knew of him making any large gifts of money to any person. In connection with my A.A.A. duties I tried to get him to accept government refunds for lime which he placed on his land, but I was unsuccessful."

He gave no further testimony. Later he was recalled for further direct examination and testified that on June 30, 1948, he took some other A.A.A. papers to the Probasco home for Mr. Ransom, and Mrs. Probasco delivered them to the witness after they were signed by Mr. Ransom.

O. O. Whicker, age fifty-six, tenant-farmer, first knew A. L. Ransom twenty years earlier and occupied one of his farms for nineteen years without a written lease, never had any trouble with him. He got ready for fall plowing and sowing fall wheat in August 1949 when Mr. Ransom, who had torn down the old barn and was going to build a new one, changed his mind in September, as he planned to use the buildings for storage of grain, and told the witness he might farm the ground but he would have to get another place in which to live. Witness testified that Ransom handled all his business transactions in operating his farms, and always attended to his own business with him, except during the last years he knew that Mrs. Probasco did telephoning for him. He testified that he had heard Abe remark several times that he

had seen a paper with the names of Lou Yates and Velta Davis on it asking that a guardian be appointed over him; he had heard Abe say that Orpha Taylor did not want him to move the house to the Probasco home and that she would burn it, and that he had hired a man to watch the house while it was being moved; he heard him say that an old Bible was missing and he blamed Lou Yates for it, and telephoned her about it; he had many business transactions with him over the years, and he noticed a change in his ways during the last year or two of his life; during the first fifteen years anything he told you, you could depend on, but later he might change his mind overnight, and in the last year or two of his life he heard Mrs. Probasco telephoning about farm leases, and she had asked him to sign a lease for the farm year of 1948-1949. He saw A. L. Ransom for the last time on March 2, 1950.

Later Mr. Whicker was recalled for further direct examination. He was asked:

"Basing your opinion upon what you have observed of A. L. Ransom, and the conversations that you had with him and the facts you testified about him this morning, I want you to state whether in your opinion he was, on the 27th day of January, 1940 [no doubt 1950 was intended], of sound or unsound mind?" Proponents apparently started to object and the court said: "The witness may answer." The witness did not answer the question, but said, "I never saw Abe from March until the date you are talking about." This question was then asked: "Basing your opinion upon the things you have seen in the past, what would you say as to whether or not he was, on that date, of sound or unsound mind?

"Mr. Stuart: The same objection last urged.

"The Court: The witness may answer.

"A. I say he was unsound *or he was terribly influenced in some way.*" (The italicized words were stricken.)

The objection to the question should have been sustained. It permitted the witness to base his opinion on matters he had not told the jury. There is no evidence that he had seen Mr. Ransom on January 27, 1950, nor had he testified to any observations of, or conversations with, him on that day. He last saw him on

March 2, 1950, but testified to nothing as of that date. As a non-expert he was not qualified to express an opinion of mental unsoundness of the testator on January 27, 1950. His qualifications and the foundation laid were insufficient to permit him to give such opinion on any date.

On cross-examination the witness stated that he and Abe always divided the grain together, settled the cash rent and adjusted any differences, and Abe seemed to know what those ought to be; he was mentally competent to look after his business if he had not been overpowered; he never said in talking to the witness that he would have to get permission from anybody else—"on March 2, 1950, I met Uncle Abe on the road and told him I couldn't find a place to move and he'd have to give me more time. 'O.K.', he said, 'Mr. Whicker, that's alright. Nobody's going to move in here until you can get out in a reasonable time.' The next evening the sheriff came down with a three-day notice for me to get out. Up to this day, Mr. Ransom never knew that notice was sent, because he never done business that way. You know he didn't do it, I know someone else did it. I know this because if Abe Ransom told me anything, you could depend on it. * * * In 1949, the last year I talked with Abe Ransom about renting the place, he told me he wanted to put his share of the crops from other farms in the buildings on the place so it would be close where he could look after them. It didn't make sense to me to use that good house for grain." (The record shows that the floors and sills in the house were in such condition that Mr. Ransom replaced them.) The witness admitted, after some equivocation, and after being told by the court to answer, that he had told proponents' lawyer that he "couldn't see why anybody would claim Abe Ransom was insane or crazy."

Later in the trial the court voluntarily struck the opinion given by Mr. Whicker that the testator was of unsound mind.

Toward the close of contestants' evidence, Mr. Whicker was again recalled for further redirect examination. He repeated his previous references to the house moving, the guardianship matter and the missing Bible dictionary. He also testified that Abe said to him after the partition sale of Joe's land in 1949, at which Abe bid in most of it, that he resented Whicker's running up the sale price on some of it, and when the witness told him he had not

bid on any of the land Abe told him that he had heard that he did. The witness also stated that in 1943 two men from Des Moines had told him he would have to buy bonds if he did not fix the house down there.

After objections had been sustained to questions asked the witness as to the mental unsoundness of Mr. Ransom, the witness testified that during the year immediately prior to March 2, 1950, he probably saw Mr. Ransom twice a week, and in the nineteen years he was a tenant he saw him on an average of twice a week. The witness was then asked:

"Basing your opinion upon the facts you have testified to here, and your observation of Mr. A. L. Ransom, and limiting yourself to the occasions when you saw him during the year immediately preceding March 2, 1950, would you say he was of sound or unsound mind?

"Mr. Stuart: Object to that as incompetent, immaterial and irrelevant; the witness is not properly qualified and no sufficient foundation is laid, and it is impossible to qualify this witness as a layman to express the opinion he is being called upon to express.

"The Court: I think I will let the witness answer; overruled."

While the witness testified that he saw the testator twice a week, or one hundred four times during the year noted, this did not qualify him to give an opinion of mental unsoundness as to each time. He could express such opinion only as to such times during the year that he had seen the testator, and then only after he had told the jury circumstances and incidents of those visits which would reasonably support his opinion. The record discloses very few visits concerning which the witness testified as to any incidents thereof, and in none of them were the matters related inconsistent with the soundness of A. L. Ransom's mind. We are satisfied that the objection should have been sustained.

Otto H. Carr, the assessor, testified that in 1948 and 1949 he did not see Mr. Ransom when he called; Mrs. Probasco said she could attend to it, and on one of the occasions she signed Mr. Ransom's name to the roll and on the other occasion she signed

his name as agent. On one of these occasions she gave the witness the bank balances of Mr. Ransom; another time she signed Mr. Ransom's name to the application for a homestead exemption.

Donald Davis, age twenty-seven, a son of Lloyd and Velta Davis, contestant, testified that: he rented land of his great-uncle, Abe, in 1948 and 1949 and last saw him about March 1, 1950; while raking leaves in April 1949 Uncle Abe came by and the witness asked him how he was doing, and he said "all right if the relatives would leave him alone", and said there was a petition to put a guardian over him, "which had my mother's name and Aunt Lou Yates's name" on it; Abe had told him of the missing Bible dictionary and said Aunt Lou had stolen it, and that Orpha Taylor tried to stop him from moving the house. The witness was then asked to give his opinion, based on the matters to which he had testified, "whether or not A. L. Ransom was of sound or unsound mind on the 27th day of January, 1950." Objection that the witness was not qualified to answer was overruled, and after his answer that he "was either incompetent or had been persuaded" had been stricken, the witness testified that in his opinion the testator was of unsound mind on January 27, 1950.

The objection should have been sustained. The witness last saw the testator about March 1, 1950; he did not see him on January 27, 1950, and the last previous time that he saw him when he testified to any incident was at the leaf raking in April 1949. He was not qualified to give the answer he did.

On cross-examination he testified to dividing grain and fixing fences with Abe, and that Abe knew what he was doing and was sensible and rational in what he said and did; that his uncle did not always recognize him until after he spoke to him, and sometimes called him Tommy, his uncle's name, or Lloyd, his father's name.

Later in the trial the court struck the answer of the witness that his uncle was of unsound mind on January 27, 1950.

Marvin Howard, age forty, whose daughter had married a son of contestant Velta Davis, operated a garage, and took a yearly lease in 1945 from Mr. Ransom of an acreage in Joe's estate, which lease was renewed each year for five years. He testified he first noticed a change in Mr. Ransom in 1948; that he

was failing a little; Mrs. Probasco had called him about the lease for another year, and I gave her to "understand I wasn't doing business with her", and "Abe finally fetched me a contract with Carl Ransom and told me he wasn't capable of taking care of his business at that time, and told me to pay Carl the rent." He testified that in the fall of 1948, in his shop, Abe said he was going "to kill John Sales." The witness gave no other details about it. The last time the witness saw Abe Ransom was "along about '49, in January."

The witness was asked, basing his answer on what he had related to the jury, his opinion whether A. L. Ransom was of sound or unsound mind on January 27, 1950. Over proper objection he was allowed to answer that he "would say he was unsound." The ruling of the court was erroneous for the reasons hereinbefore given. The court later struck the answer from the record.

Roy Yates, age sixty-two, farmer, husband of Lou Yates, contestant, had known Abe over fifty years, and "never had a bit of trouble with him; he looked after his own business with me; he was absolutely a religious person, no doubt." The witness testified that he and his wife called upon Abe in 1948, and in a conversation in which he took no part (being incompetent under the statute) his wife asked Abe about a paper she had heard she had signed to appoint a guardian over him, and she told him she had not signed such a paper, and Abe replied, with some heat, that he had seen the paper and her name was on it, and my wife said that if her name was there it had been forged. The witness testified that he had no conversation with Abe thereafter. This was the extent of his testimony.

Clifford Singly, age forty-six, whose sister was the wife of Mr. Powers, one of the contestants' lawyers, testified that: he was a farmer whose parental home was across the road opposite the old Ransom homestead; he had known Mr. Ransom since childhood, and later bought a farm on eighty acres of which Mr. Ransom held a mortgage and on which the witness paid semi-annual interest until the principal was paid. He had no other business transactions with him. He testified that Abe was forgetful. (His own memory was remarkable.) He testified that the last time he saw Abe was the last week in November 1949 when he went into the Texaco service station to get five gallons of oil;

it was in the evening and the lights were not on, and as he stepped in he saw A. L. Ransom, and he said, "Hello, Abe, you are looking well", and Abe said "I have been feeling pretty well, but I don't believe I know you", and when I told him, he said "I declare." He testified that he next saw Abe on April 15, 1950, as he was sowing oats on the old Singly place and saw Mrs. Probasco and her driver stop the car in the road opposite the Singly home and Mr. Ransom alighted, and the car went on; that Abe stood in the road a short time looking toward the old Singly home; the witness thought he was hesitating as though he was undecided whether to call upon Mrs. Singly (the mother of the witness) in whose home Mr. Ransom in years past had often visited; he took a step or two toward the Singly home, which was directly across the fence, and after some hesitation he turned back and crossed the ditch and went through the fence into the old Ransom place, walking slowly as though he had plenty of time. The witness recalled that on the 18th of September, 1949, Abe was at the gateway of his old home picking wild grapes, and Abe kidded about making some wine; the witness told him of the death of an old-time merchant, and Abe said: " 'The name is familiar, but I don't believe I know him' "; Abe was thinking of other matters, as the witness said he immediately began talking about the plan to put him under guardianship and said that he was still able to conduct his business. The witness said in the second week in June 1949 he picked Abe up as he was walking along the road and Abe, not recognizing the driver of the car, said he was going over to Clifford Singly to see him about fixing a line fence. On the 24th or 25th of May, 1949, the witness said he and his mother were driving by the Probasco home and Abe was sitting in a lawn chair, and his mother said " 'let's stop and visit with Abe' ", and "by the time we got in the driveway in the yard, Abe was practically at the car. He came up and said, 'Hello, Etta.' That's my mother's name. He recognized my mother and me, too. Mother complimented him on how well he looked, and they passed comments on one another."

The witness spoke of the religious life Abe had led and his faithful devotion to, and attendance at, the church until the last year of his life; that he always conducted his business as a farm-

er in a mannerly way. Asked to describe the thing he observed in Mr. Ransom that indicated to him a change in his mental condition, the witness answered, "Forgetfulness, and his wandering, as I would call it, *not being able to decide which way he wants to go.*" The italicized words were stricken, and the witness said: "There was just this one particular time [in the road at the Singly home] *that I must say he didn't know which way he was going.*" The italicized words were again stricken.

 Mr. Singly was then asked: "Basing your opinion upon the facts as you have stated, would you say that A. L. Ransom was of sound or unsound mind during the period of time that you had him under observation, and limiting your answer to the period of time from the month of May 1949 until the date that you last saw him, which was on or about the 15th day of April, 1950?" (Objection that the witness was not qualified to answer; had not related sufficient details upon which to express an opinion, and the prior time mentioned was too remote.) The court sustained the objection on the ground of insufficient foundation. The ruling was right. The witness had testified to incidents on a number of dates within a period of almost a year. Any opinion given should have been limited separately to each of these dates, but instead the question asked for an opinion as to Abe's mental unsoundness during the entire period, which included January 27, 1950, the day of the execution of the will. As a layman the witness was not qualified to express such an opinion.

Robert Ransom testified that Abe told him of the guardianship papers and the resulting change of his feelings toward Mrs. Yates and Velta Davis. The witness testified that he knew who had stolen grain from Uncle Abe, and that his uncle hired him to shuck Abe's share of the corn on land that Roy Yates had leased of Abe on a fifty-fifty share. The witness was not asked for any opinion of Abe's mentality.

Lou Yates, a contestant and a niece of Abe, and wife of Roy Yates, who was a tenant of Abe for several years, testified that: Uncle Abe had not been in her home for about eight years; that she never stole the Bible dictionary from the A. L. Ransom home, but saw it there when she went to look up some family records in the old family Bible there; Uncle Abe put the book back in the bookcase. Her testimony in direct examination about signing

guardianship papers for A. L. Ransom was evasive and contradictory:

"Q. Did you ever sign a paper asking that a guardian be appointed over Abe? A. Once. Q. Did you sign a paper? A. I don't know whether I did or not. Q. Do you understand my question, Lou? What I was asking was, did you ever sign a paper for anybody asking that a guardian be put over Abe? A. No. [A recess was taken.] Q. Now, Lou, do you understand my question? The question was whether or not you ever signed a paper asking for guardianship over your Uncle Abe? Do you understand my question? Did you sign any such paper? Do you understand my question really? Did you ever sign a paper asking that Abe be put under guardianship? A. If I ever did it was in your office. Q. Did you ever sign any in my office asking that a guardian be appointed over Mr. A. L. Ransom? Did you ever remember of signing such a paper? A. I don't know whether I signed one or not. Q. You don't know whether you signed any or not? You don't just remember, is that what you mean? A. I don't remember."

On cross-examination Mrs. Yates testified:

"I do remember that some of the relatives got together and discussed the question of putting a guardian over Abe. I was at that meeting. Mrs. Houk, a cousin of mine, never stopped at my house and talked with me about appointing a guardian. The question of appointing a guardian was discussed in the bank, and in Mr. Powers' office. [Redirect examination]—Nothing was ever signed, no proceedings were ever started for the appointment of a guardian."

Orpha Taylor, a contestant, age sixty, unmarried, lived on a farm with two brothers, the contestants Elza and Doris Taylor. She was also the sister of proponents Leo Taylor and Mabel Houk. She was badly injured in an automobile accident and had since moved about with difficulty aided by a crutch. She testified that she was often in the old Ransom home before her injury and sometimes afterward, but that Uncle Abe was in her home but once after that trouble of some stealing; the last visit she made Abe in the Probasco home was after he bought a house that he

moved over there. She denied that she threatened to burn the house or threatened to put straw under it and set fire to the straw. The witness did not deny that she opposed the moving of the house to the Probasco home.

John B. Taylor, vice president of a Centerville bank, and former postmaster in that city, testified that: he was acquainted with A. L. Ransom for forty years and had transacted business with him; he was a hard-working man, a large landowner, very close and very religious, a generous contributor to his church, attended to his own business in the early years, but had changed physically and was mentally less alert in his last years; he visited him one or more times a month during the last year of his life at the Probasco home and observed some hesitation in his speech, would at times forget what he had been talking about, and at times be confused; Mrs. Probasco kept his records for him during the last year; he told him that Orpha Taylor was opposed to his moving the house out to the home and that she would burn it before she would let him do it; he said there was straw put under the house and he hired a man three nights to guard it; he told him that he did not attend church at Moulton during that year; he showed a changed attitude towards the church.

Mr. Taylor was asked: "Based upon the facts which you have related, would you say that Mr. A. L. Ransom, at the time you had him under observation the last year you visited at the Probasco home, that he was, or whether he was, competent or incompetent?" Objection that the witness was incompetent to testify, had not shown himself qualified and had not related sufficient facts upon which to base a conclusion and opinion was overruled. The witness answered that "the last part of the year he was incompetent."

The question did not call for an opinion on a condition of body or mind, but for some ability or inability to do something, the nature of which was not specified, the answer to which might involve a mixed question of law and fact. The question for determination was the testamentary capacity of the testator. It is far from clear whether the inquiry would throw any light upon it. The question is a departure from those ordinarily used in such actions. The inquiry was directed not to a particular time, such

as the execution of the will, but to an entire year. The fact that one may lose the thread of his thought, or the subject under discussion may escape him for a time, in conversation on occasions, would hardly justify the opinion of a layman that he was mentally incompetent throughout an extended period of time. It is common knowledge that one's mental alertness may vary with conditions or the time and place. We are not called upon to say whether the question would have been proper to an expert in this particular field, but it is our conclusion that it was not a proper inquiry to a nonexpert, such as the witness, and that he was not qualified to answer it, and the objection should have been sustained. The answer was indefinite with respect to time as it included over three months after the will was executed.

On cross-examination the witness testified that his opinion was not based on the Moulton house matter, or because Abe had a falling-out with members of the church or because he did not like the way the church was run. He testified that he had several business transactions during the last year of Mr. Ransom's life and in the fall of 1949 sold considerable land to him as referee; that Abe knew what land he desired and what he did not wish to buy. "He knew the location of the land he wished to buy and told me where it was. I relied on his judgment and saw that he got the land he told me to buy. I never had any doubt about his judgment that he knew what he wanted. He told me to bid on one particular piece that he especially wanted and to keep bidding, whatever it sold for."

Proponents' renewal of the motion to strike Mr. Taylor's answer because no facts of any consequence remained in support of it was sustained, and we think rightly sustained.

But the witness was recalled for further redirect examination. After he had answered that he had given consideration to all of the facts he had related in his testimony in arriving at his stated opinion that A. L. Ransom was incompetent, he was again asked to say whether under the facts he had testified that he observed during the last year of Mr. Ransom's life, he would say he was competent or incompetent. Before objection could be made that sufficient foundation had not been made and the witness was not qualified, the witness said the word "incompetent", which the court let stand.

On re-cross-examination he testified that when Abe told him that straw had been found, which had been set on fire, under the house being moved and Abe thought somebody was trying to burn it, he thought that Abe believed it was the truth, and that Abe was not imagining it, and in arriving at his opinion he did not give consideration to the fact that Abe had employed a watchman at the house. Asked what he did base his opinion on he answered: "Just his general, his business transactions and things he would talk about. Q. Can't you be more specific than that? A. No, just in general. Q. Well what business transactions did he make that you thought indicated that he wasn't all right? A. *He didn't make any.* He'd talk about things. He sold his thirteen acres and it was a good sale. He was forgetful during that last year, and it is true that I said that it wasn't any more than anyone else at that age. I can't recall at this time any other specific facts on which I based an opinion that he was of unsound mind." (Italics ours.)

Contestants' renewal motion to strike the answer of the witness that the testator was incompetent was sustained. We agree with this ruling. After more redirect examination, repetitious of the previous testimony of the witness, he was again asked the same question as to the testator's incompetency. Proper objection to it was rightly sustained.

Dr. E. A. Larsen, a physician and surgeon in practice for twenty years at Centerville, was acquainted with the testator, and attended him in his last sickness, and made out the death certificate. He testified that he had pneumonia and "some arteriosclerosis and cerebrosclerosis", which are permanent and progressive diseases caused by hardening of the walls of the blood vessels and decreasing the lumen or passageway thereof, thus diminishing the blood supply to the tissues of the body, and impairing them; forgetfulness and delusions are symptoms related to this condition, and dislike for others can be. He testified that nobody could estimate the time associated with the disease.

It is significant this doctor was not asked his opinion as to the mental soundness or unsoundness of the testator during the time he attended him or on January 27, 1950, or the extent or progress of these diseases. It is a fair assumption that his answer would not have aided contestants and probably would

374

have been adverse. His testimony was that Mr. Ransom had "some" arteriosclerosis.

Mrs. Opal Cooper, a long-time resident, testified to a fainting spell of Mr. Ransom May 1, 1949, when he called at her home in regard to pasture rent. He had talked to her not long before this incident about people trying to run his business, and that he was able to do it himself, and in 1940 or 1941 she heard him tell why he had not prosecuted some persons for stealing his grain.

Theodore Murdy, an A.A.A. committeeman, said Abe would not sign papers to get government money to reimburse him for lime expense. He testified: "I do not say I noticed much, if any, change in his physical condition during his last few years." Of the lime matter, the witness said: "He just didn't agree with me on the lime proposition, that's the substance of it. * * * Abe Ransom was strictly honest. He didn't think he had any lime check coming."

The court, over proper objection, did not allow the witness to say whether Abe was confused about the matter still or understood the witness.

Velta Davis, contestant, a niece of the testator, testified that he "was always a hard-working man, always busy, even after he actually quit putting in the crop, always busy fixing fences and things like that." She denied signing any guardianship papers, but was not asked about her connection with the contemplated guardianship.

Esther Davidson and husband, Stephen Davidson, testified that in 1941 they had advertised an eleven-room house in Centerville for rent, and Mrs. Probasco inquired about it and they called upon her when they heard nothing further from her, and she told them she would not take the house as Mr. Ransom had promised to give her the property she was in. Mr. Davidson testified that he met Mr. Ransom, and that he said he was letting Mrs. Probasco have the forty for his care and keep. This talk was in July 1941.

Mrs. Davidson said that Mrs. Probasco told her Mr. Ransom was not "in his right mind and hadn't been for some time." Quoting Mrs. Probasco: " 'She said he went out yesterday, that would be Saturday, and cut the hedge, and she said you can't do

nothing with him, he always has worked and he thinks he should keep on working, and she said I've had a time with him.' "

Art Wood, age seventy-six, had known Abe for fifty years, and testified that about two years before he saw Abe in the back part of a store, and: "He didn't recognize me when I spoke to him. We stood and talked and I think I told him who I was, and he said, 'Well, I didn't just recognize you.' It's happened to everybody, I think, failing to recognize someone. There was nothing in his talk that was unusual, nothing only visiting with me."

William Swartz, age sixty-eight, testified to renting pasture from Mr. Ransom and that he had seen him wandering about in 1948 and 1949, and "we would show him over toward the house"; that Abe had put a lot of junk and implements in a barn on the place, and "told us to move it out so our cattle could go in the barn"; Abe attended to the renting of the ground and collected the rent; he had definite opinions about what he wished to do. The witness said he had many conversations with Abe, but he gave no testimony that he ever talked irrationally.

Mrs. Ollie Brown, whose mother was Abe's sister, and who lived in Nebraska, attended Uncle Abe's funeral, and said that after the funeral Mrs. Probasco brought a Bible dictionary from his room and gave it to her. Mrs. Lou Yates testified that Abe had told her he had two of these Bible dictionaries, and Roy Yates testified that Abe had so told his wife.

Elza Taylor, contestant, a nephew of the testator, testified to no matters of importance. He said the Probasco home was but a small, four- or five-room house when Abe first went there and it was enlarged by the house that Abe moved there. Abe died in that home. He testified that Mrs. Probasco was not related to the Ransoms; that he had visited Abe in that home, but he never had any business dealings with him. He was not asked as to Abe's soundness or unsoundness of mind.

Lionel Clinkenbeard and Junior Howard also testified for the contestants, but gave no testimony of any material importance on any issue in the case.

Dr. E. F. Ritter, age thirty-nine, in the general practice of medicine at Centerville, was asked a hypothetical question which was restated several times. As finally asked it was as follows:

"Doctor, assuming a man died on the 14th of May, 1950, at the age of 87 years, of pneumonia, bronchial type, due to cerebrosclerosis and arteriosclerosis, and assume that during the last year of his life he was forgetful, became easily confused, and was unable to count his money when above four figures, and failed to recognize certain of his relatives and lifelong friends and acquaintances, and stated that another of his heirs, who was a cripple who lives about twenty miles from his home, had attempted to burn his house down, and who, during most of his life was devoted to his church and liberal in his donations to his church, no longer attended, claiming the Democrats had taken it over, and who stated a niece had stolen a Bible dictionary, and who became lost and unable to find his way home, what would be your opinion as to whether or not such a man would be of sound or unsound mind on the 27th day of January, 1950?"

There was no objection to the question, although it contained assumptions not supported by the record. Witness answered that if the facts stated were in fact true he would say the person would be of unsound mind.

The deed of January 26, 1950, conveying the forty acres to Mrs. Probasco, was introduced in evidence by contestants, over the proponents' objection. Contestants also offered the following checks, for $5000, $4500 and $500, each dated May 8, 1950, each payable to Nora Probasco, signed A. L. Ransom, endorsed by the payee and stamped paid. There was also another check for $650 dated April 8, 1950, signed A. L. Ransom, payable to and endorsed by Nora Probasco and stamped paid. The signature on each check was identified as that of A. L. Ransom and the handwriting in the body of each check as that of Nora Probasco. On the face of the $500 check is written the word "care"; on the $5000 check are the words "thirteen years care"; on the $4500 check are the words "care in 13 years"; and on the $650 check, the words "care & keep." Proponents' objections to the checks were sustained when offered, with permission of the contestants to be heard later. Motion made at the close of contestants' evidence by the proponents to withdraw from the record the three checks of May 8, 1950, because there was evidence that Mr. Ransom was unconscious on that day, and also to withdraw the check of April 8, 1950, and the deed to the forty acres, was overruled by the court.

Since the substance of considerable of proponents' evidence has been stated in the fore part of this opinion we will make any further reference to it very brief. It is our definite conclusion and conviction that the testimony of the twenty-five or more witnesses for the proponents was of such character, weight and probative worth that it clearly refuted the written objections and the contentions of the contestants, and established beyond reasonable question that the will of the testator was the product of a sound disposing mind, free from, and uninfluenced by, any delusions, or by any undue pressure or coercion by others. With the exception of not more than one or two, none of these witnesses had any financial or other beneficial interest in the outcome of the litigation. All of them had known Abe Ransom from a few years up to many years, and many had close associations and various business dealings with him.

We will not attempt to summarize the testimony of any of these witnesses. Many of them transacted business with the testator during the last year of his life, before and about the time the will was executed and afterward until shortly before his death. What hurt him the most was the fact that the contestants and the spouses of those who were married began meeting and planning with their attorneys to place him under guardianship. One meeting was at the bank in Centerville in 1947, and another meeting was in 1949 at an attorney's office. Abe had been successful in acquiring and conserving a substantial amount of property and he rightly resented their attempts to place it beyond his control. He told one witness that some of his relatives thought he was living too long.

The inventory and preliminary inheritance tax report filed by the executor February 28, 1951, lists the property of the estate and the appraisal thereof by the inheritance tax commissioners as follows: real estate, $77,048; bank deposits, cash items and accounts receivable, $14,916.14; other personal property, $1305; the forty acres deeded to Mrs. Probasco, $7500; the claim against Mrs. Probasco on the $10,000 of checks, "No value", for a total of $110,769.14.

I. The burden was on the contestants to establish at least one of the three grounds alleged in the written objections

which they filed to the probate of the will. The execution of the will was not challenged, and the proponents had no burden with respect to the issues raised by the objections. The main case of the contestants was extremely weak and the court could rightly have sustained proponents' motion to direct a verdict at its close for the failure of contestants to make a prima-facie case. There was much testimony introduced by contestants that was adverse to the objections they filed. The evidence introduced by proponents was such that their motion to direct at the close of all the evidence should have been sustained. These being our conclusions, it is our further conclusion that the court's judgment that had a verdict been returned by the jury against the proponents it must have been set aside, was right.

II. The rules of law respecting the essentials of testamentary capacity have been so long settled in this state and have so often been stated and discussed in the decisions of this court that we will say little further about them. They have recently been concisely and correctly stated by Justice Thompson, in In re Estate of Rogers, 242 Iowa 627, 630, 631, 47 N.W.2d 818, 820:

"Where this issue is involved the burden is upon the contestants to show lack of mental capacity * * * in one of these respects: (1) To understand the nature of the instrument he is executing (2) to know and understand the nature and extent of his property (3) to remember the natural objects of his bounty, and (4) to know the distribution he desires to make. If his mental capacity is not equal to any one of these tests he cannot make a valid will. * * * Conversely, the law is slow to deny the right of any person to dispose of his property by will as he sees fit. No mere impairment of his mental or physical powers, so long as he retains mind and comprehension sufficient to meet the tests above set forth, will render his will invalid. In re Estate of Sinift, 233 Iowa 800, 810, 10 N.W.2d 550, 554; Perkins v. Perkins, supra [116 Iowa 253, 90 N.W. 55]. And we have often said that there must be substantial evidence of mental unsoundness in order to generate a jury question. In re Estate of Sinift, supra; In re Estate of Fitzgerald, 219 Iowa 988, 996, 259 N.W. 455, 459."

There is no evidence that the testator was lacking in any of

the requisites of testamentary capacity. That he knew the nature of the instrument he executed is established beyond reasonable question by the testimony of D. W. Harris, the scrivener, of Betty Russell, by the certificate of the subscribing witnesses, which stated "we believe him to be of sound mind on this date", and by the testimony of Doctor Cox. Mr. Harris testified that the testator "was an intelligent man, and he knew many things that the ordinary person doesn't know when it comes to legal matters." Mr. Ransom had previously executed two wills, and he knew the nature and purpose of such testamentary dispositions.

The record is replete with direct and indirect evidence that he knew the nature and extent of his property. Mr. Harris testified that in the discussion preliminary to drawing the will Mr. Ransom told him the property he possessed. His whole adult life was devoted to the acquisition of land, even to his last weeks. He preserved his deeds and abstracts of title. In the partitioning of Joe's estate, in the last year of his life, he bought most of the land and told the referee just what parts of it he desired and the parts he did not desire. He went over his extensive landholdings frequently; he attended personally to leasing the land, collecting the cash and crop rent, depositing money in several banks personally or by others under his direction. He knew the boundary lines of his land and personally repaired these fences and directed the construction of several miles of them. The testimony was almost unanimous that he was a careful, conservative and scrupulously honest businessman. He knew his own property rights and was meticulous in respecting those rights in others. His investments were sound. As John B. Taylor, witness for contestants, who had known Abe many years and was familiar with his business affairs, said: "He didn't make any transactions that weren't right." Abe's remembrance of the exact legal description of the land he conveyed to Mrs. Probasco—40 acres out of his 1200 acres—was most remarkable.

With respect to his remembrance of the natural objects of his bounty, there is no testimony that he did not know each of them and that he did not have all of them in his mind when he executed the will. The complaint of the contestants really is that he remembered his relatives too well. Only one witness gave any testimony that Abe ever failed to recognize any of the nu-

merous relatives—thirty or more nieces, nephews, grandnieces and grandnephews—and that testimony is of little probative value. This witness was Donald Davis, a grandnephew. He said Uncle Abe always recognized him after he had spoken to him, as a relative, but he could not always remember his first name, and sometimes would call him Tommy, which was his mother's brother's name, or sometimes Lloyd, which was his father's name. Errors of this kind are of common occurrence among persons of sound mentality.

Nor is there any evidence that the testator did not know the testamentary distribution he desired to make. The will itself definitely indicates the contrary. It was clearly in his mind. He named each of the contestants specifically as persons whom he did not desire to share in his estate, and he stated the reason, in paragraph 2 of the will. After making another bequest and a direction to the executor, the testator devised the remainder of his property to his heirs-at-law, "expressly excluding therefrom the persons named in paragraph 2 hereof." The testator had an absolute right to make this disposition of his property if he had a sound mind and the intelligence and understanding to know and comprehend what he desired to do and was doing. There is no evidence of substantial probative value that he did not have such mentality at the very time he was executing the will.

The fact that the testator may have had hardening of the arteries and cerebrosclerosis on May 8, 1950, did not establish the invalidity of the will executed on January 27, 1950. These diseases are slowly progressive and their advance or effect may vary in different individuals. There is no evidence that if the testator had these physical afflictions on January 27, 1950, they affected his testamentary capacity. Doctor Cox testified that he detected no cerebrosclerosis at that time, and that he never had previously.

This court has many times held that old age and the physical and mental impairments that are its normal accompaniments—bodily infirmities, the waning of the physical or mental alertness of earlier years, weakening of the memory, forgetfulness, the failure to immediately recognize old acquaintances, impairment of the sight or hearing, repetitious narrative, carelessness in dress, childishness or other eccentricities—will not invalidate the

will of a person, if he has mentality and intelligence sufficient to bring himself within the requisites of testamentary capacity hereinbefore stated.

The contestants have failed to establish that the testator lacked these essentials when he executed the will offered for probate.

III. The contestants wholly failed to establish that the will was the result of or was in any way affected by any mental delusions or hallucinations of the testator. The matters which the contestants designate as delusions were not fantasies, oddities or the imaginations of his mind. They were not matters which existed without basis, nor were they the products of a diseased, weakened or degenerated mind.

Each one of them—the church matter, the missing Bible dictionary, the moving of a house, the guardianship and the closing of the road—had definite and actual fact basis, as established by the record. There is not the slightest indication that his differences with those in charge of the church had anything to do with the will he made. None of the contestants was involved in the church matter.

The contestants—although Orpha Taylor is not specifically named—were all involved in contemplated guardianship proceedings against the testator. The fact that there was such a movement was definitely established. There is testimony that the testator said he saw some guardianship paper with two of the contestants' names on it. The record is not clear that such a paper did not exist.

It is not disputed that Lloyd Davis, husband of one of the contestants, was active in seeking to close a road, to the damage of the testator's land. The testator was a reader of the Bible and had this dictionary as an aid in his study. He had two of them, one at his room, and another which he kept at his parental home with the old family Bible, in which the record of births, deaths et al. was kept. Mrs. Yates saw it and desired to buy it. He declined to sell, and later it could not be found and he telephoned her about it and apparently blamed her for its loss.

We need not pass judgment upon his conclusions and actions in these matters, but it cannot be said that they were without foundation or that any resentment he bore against anyone in-

volved was unnatural or indicative of an unsound mind, or that it is legal justification for interference with the testamentary distribution which he made of his bounty.

 IV. If every item of evidence on the issue of undue influence is accepted as true it lacks much of establishing the issue. The record shows the testator to have been a man of determination, strong and stable convictions, and a master of his own business and affairs. He gave personal attention and effort to these from his youth on through his life until his physical infirmities compelled him to avail himself of the aid of others, and they performed only mechanical and ministerial assistance as directed by him. His hearing failed and others did telephoning for him. In the last year of his life Mrs. Probasco kept such accounting of income and expenses as was needed. She and others at the home sometimes made deposits for him in the different banks where he did his banking business.

There is not the slightest evidence that Mrs. Probasco had anything to do with the making of his will or that it expressed her will and desires rather than his. A holding that she exerted any influence in fixing any provision of the will could be based only on merest conjecture. She received nothing under the will. There is no evidence that she bore any ill will against any of the contestants' or that she had any favorites among the beneficiaries under the will, many of whom lived in distant states.

So far as the record discloses, the plan to improve the home by adding to and remodeling it and installing up-to-date utilities was wholly his. It was his property then and the expense was no doubt paid by him. This was done in 1942. The contestants' evidence was that at that time he told others that he was going to give the property to Mrs. Probasco. He took pride in the home. He was nursed back to health after a long and severe illness in the home, and was always well cared for.

She had the opportunity to use influence which association with him in the home afforded. But the will itself and the circumstances attending its execution indicate no inclination on her part to influence or dominate the testator in his testamentary distribution. The undue influence which substitutes itself for the will of the testator, and destroys his free agency, must operate at the very time the will is made. That the procuring of the

checks by Mrs. Probasco on May 8, 1950, long after the execution of the will, affected in any way its provisions or execution would be the merest guess. In re Estate of Lochmiller, 238 Iowa 1232, 1237, 30 N.W.2d 136; Zinkula v. Zinkula, 171 Iowa 287, 299, 300, 154 N.W. 158; In re Will of Brooke, 238 Iowa 306, 26 N.W.2d 688; In re Estate of Klein, 241 Iowa 1103, 1118, 42 N.W.2d 593; In re Estate of Hadley, 241 Iowa 1280, 1289, 45 N.W.2d 140; In re Estate of Rogers, supra, 242 Iowa 627, 635; Perkins v. Perkins, supra, 116 Iowa 253, 262; Penn Mutual Life Ins. Co. v. Mulvaney, 221 Iowa 925, 927, 928, 265 N.W. 889; Gates v. Cole, 137 Iowa 613, 617, 115 N.W. 236; Kerkhoff v. Monkemeier, 188 Iowa 103, 106, 114–117, loc. cit. 115, 175 N.W. 762, 767—"Under no theory of the case, giving to all the testimony of the plaintiffs its greatest probative force, would a jury be justified in saying that the testator was unduly influenced in the making of the will in question."

The judgment is—Affirmed.

OLIVER, GARFIELD, WENNERSTRUM, MULRONEY, HAYS, and THOMPSON, JJ., concur.

SMITH, C. J., concurs in result.

LARSON, J., not sitting.